Opinion issued November 10, 2011



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-08-00975-CR

———————————

Nkrumah Lamumba Valier, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 183rd District Court

Harris County, Texas



Trial Court Case No. 1150625

 



 

MEMORANDUM OPINION

A jury
found appellant, Nkrumah Lamumba Valier, guilty of the offense of aggravated
sexual assault[1] and
assessed his punishment at confinement for forty years and a $10,000 fine.  In two issues, appellant contends that the evidence
is legally and factually insufficient to support his conviction and the “trial
court constructively denied [him] his right to testify in his own behalf by
ruling that the State could impeach” him with another sexual assault
conviction.

We affirm.

Background

          Tiffany
Rogers, the complainant, testified that on the evening of May 15, 2005, after
leaving a bar, she drove her car to a nearby gas station to use a pay telephone.  While making her call, a young, “nice-looking
black man” driving a four-door car pulled up to her and asked her if she was
“working.”  The complainant said “no” and
then asked the man if he was a police officer. 
She explained that she understood that the man was asking her if she was
“prostituting,” and the two engaged in a conversation for five minutes during
which the complainant agreed to have sex with the man for $100.  After driving her car back to the parking lot
at the bar, the complainant got into the passenger seat of the man’s car, and
he drove the car away from the lot.  

While driving, the man reached
behind his seat, pulled out a gun, pointed it at the complainant’s head, and
told her that he was going to have sex with her.  The complainant, who was afraid that the man
was going to shoot her, told the man that she was married, had children, and
did not “even do this.”   He drove his car to the back of the driveway
of an abandoned building, where he told the complainant to remove her pants.
The complainant complied, and the man reclined her seat and got on top of her and
engaged in sexual intercourse with her. 
The man continued to point the gun at the complainant during the assault,
and she remained afraid for her life throughout the assault.  After two or three minutes, the man was
“done,” and he told her to get out of his car. 
The complainant jumped out of the car and hid in some bushes.  The man kept the complainant’s purse, but he
threw her keys to her.  After five or ten
minutes, the complainant walked to a nearby house and asked the homeowner to
call for emergency assistance.  

          After
an ambulance and police officers arrived, the complainant told the officers
that she had been raped.  She did not
tell the officers that she had been “prostituting” or, prior to the assault,
the man who had assaulted her had offered her money for sex.  The complainant explained that she did not
provide this information because she was embarrassed, she knew one of the
officers, and she was concerned about getting into trouble.  The complainant then went to a hospital for a
sexual assault examination.  

Approximately five or six months
later, a police officer called the complainant and asked her to explain what had
happened.  In response to the officer’s
questioning, she agreed that it had been “an act of prostitution gone
wrong.”  In January 2008, Houston Police
Department (“HPD”) Detective K. McMurtry contacted the complainant to tell her
that HPD “had a positive match on the DNA” obtained during her sexual assault
examination, and he asked her to come to a police station to look at some photographs
for a possible identification of the assailant. 
She looked at a photo spread containing six photographs of different men,
but the complainant did not recognize any of the men as the assailant.  The complainant noted that the lighting at both
the gas station and the bar was “not good” and the man never got out of the
car.  She also explained that the area in
which she was sexually assaulted was dark. 

On cross-examination, the
complainant initially denied that she went to the gas station as a prostitute,
but, when she was asked to review a sworn statement that she had given in
January 2008, she agreed that she had stated that she was at the gas station at
around midnight “looking to make some money.” 
When asked if she had previously engaged in prostitution, she agreed that
she had previously “dated” a man who paid her $100 for meeting with him on two
occasions.   On the first occasion, she and the man “hung
around,” and, on the second occasion she performed oral sex on him.   In
regard to her review of the photo spread, the complainant agreed that she had not
identified anyone in it as her assailant. 
She also agreed that although Detective McMurtry showed her a photograph
of appellant “all by himself,” she did not recognize him as her assailant.  The complainant explained that after the
assault, she had described the assailant as a black man, between 30 and 40
years of age, and between five feet ten inches tall to six feet tall.   

Registered Nurse T. Dusang, a
certified sexual assault examiner, testified that she examined the complainant
on May 16, 2005.  Although she did not
find any evidence of trauma during her physical exam of the complainant, she
did find evidence of a “tear” during her genital exam.  Dusang explained that she took oral, vaginal,
anal, saliva, and fingernail swabs from the complainant, and she also combed
the complainant’s hair and obtained pubic hair. 
On cross-examination, Dusang stated that she did not recall the
complainant telling her that she had met the assailant while acting as a prostitute.  In regard to the genital tear that she observed
on the complainant, Dusang stated that superficial genital tears normally heal
within 24 to 72 hours.  

Detective McMurtry testified that
he was assigned to the complainant’s case and sent the “rape kit” to the crime
lab to be processed in July 2005.  After
processing, McMurtry learned that appellant was “the donor of the forensic
evidence” in the rape kit.  McMurtry
contacted the complainant and asked her to come to a police station for an
interview and to review a photo spread.  Although
McMurtry included a photograph of appellant in the photo spread, the
complainant did not identify any of the men included in the photo spread as her
assailant.  The complainant also did not
identify appellant when McMurtry showed her a photograph of him
individually.  The complainant did
provide McMurtry with a sworn statement in which she admitted that she was acting
as a prostitute at the time she got into appellant’s car.    

McMurty subsequently arrested
appellant, who, pursuant to McMurtry’s request, voluntarily provided a DNA
sample from a swab in his mouth in order to compare it with the sample of
forensic evidence obtained from the complainant and the rape kit.  McMurtry agreed that, prior to his assignment
to the case, another officer had attempted to make contact with the complainant
by telephone, and he did not believe that the complainant had returned this officer’s
telephone call.

HPD Crime Lab Supervisor L. Gahn
testified that she had reviewed the testing records from the rape kit performed
on the complainant.  Gahn stated that, in
early 2008, a private lab to which the rape kit was sent had tested the vaginal
swabs, anal swabs, a pair of panties, and oral swabs. Gahn noted that both the
vaginal swabs and the anal swabs tested positive for semen, and the lab
identified DNA profiles on the tested items. 
The lab obtained a female DNA profile that was “consistent” with the
complainant.  In testing the “sperm cell
fractions” from the vaginal swabs, the lab obtained “a mixture of male and
female DNA,” which included the complainant’s DNA and a “larger portion of the
DNA” from a “male contributor.”  At this
time, the contributor was unknown because the lab did not have any male sample
references with which to compare it.   In March 2008, HPD submitted a reference
sample from appellant in order to compare it to the DNA profiles that the lab
had obtained from the complainant’s rape kit.  The lab determined that the DNA profile obtained
from the sample provided by appellant and the DNA profile obtained from the
rape kit “were, in fact, the same.”   The
lab then performed a statistical analysis to determine how many people might
also match that profile.  Ghan stated
that the frequency of the profile “would be less than one in 570
quadrillion.”  Ghan explained that “it
would be very unlikely” to find “a single other individual that would also
match” the profile.  

Sufficiency

          In
his second issue, appellant argues that the evidence is legally and factually
insufficient to support his conviction because although appellant “did engage
in sexual intercourse” with the complainant “at some time,” there is no
evidence that he was the assailant that committed the sexual assault.  Appellant also asserts that the evidence
demonstrates that the complainant consented to engage in sexual intercourse
with the assailant. 

We review the legal sufficiency of
the evidence “by considering all of the evidence in the light most favorable to
the prosecution” to determine whether any “rational trier of fact could have
found the essential elements of the offense beyond a reasonable doubt.”  Jackson
v. Virginia, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979).  Evidence is legally insufficient when the
“only proper verdict” is acquittal.  Tibbs v. Florida, 457 U.S. 31, 41–42,
102 S. Ct. 2211, 2218 (1982).  Our role
is that of a due process safeguard, ensuring only the rationality of the trier
of fact’s finding of the essential elements of the offense beyond a reasonable
doubt. See Moreno v. State, 755
S.W.2d 866, 867 (Tex. Crim. App. 1988).  We
give deference to the responsibility of the fact finder to fairly resolve
conflicts in testimony, to weigh evidence, and to draw reasonable inferences
from the facts. Williams v. State,
235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  However, our duty requires us to “ensure that
the evidence presented actually supports a conclusion that the defendant
committed” the criminal offense of which he is accused.  Id.  We now review the factual sufficiency of the
evidence under the same appellate standard of review as that for legal
sufficiency.  Ervin v. State, 331 S.W.3d 49, 52–56 (Tex. App.—Houston [1st Dist.]
2010, pet. ref’d) (citing Brooks v. State,
323 S.W.3d 893, 894–913 (Tex. Crim. App. 2010)).

A person commits the offense of
aggravated sexual assault if he intentionally or knowingly causes the penetration
of the anus or sexual organ of another person by any means, without that
person’s consent and if he uses or exhibits a deadly weapon in the course of
the same criminal episode.  Tex. Penal Code Ann. § 22.021 (Vernon
2011).

Appellant’s primary argument is
that, even if the evidence demonstrated that he had had sexual intercourse with
the complainant, it did not establish that he was the man that assaulted the
complainant.  Appellant notes that the
complainant could not identify him as the assailant, there was no testimony as
to whether the assailant ejaculated or wore a condom, the complainant was
“admittedly sexually active,” and nothing in the record established whether the
complainant “engaged in other sexual acts” before she was assaulted.  

We recognize that the complainant
did not identify appellant as the assailant. 
However, the jury was able to consider the evidence demonstrating that
appellant’s DNA matched the DNA profile of the only “male contributor”
identified in the samples of the rape kit, which was collected shortly after
the assault.   HPD Crime Lab supervisor
L. Gahn testified that the samples taken shortly after the assault contained
two DNA profiles, one belonging to the complainant and the other belonging to
an unknown male.  This unknown male was
identified as appellant after appellant voluntarily provided a DNA sample.  Gahn also did not indicate that there was any
DNA evidence suggesting a third contributor in the samples taken from the rape
kit.  Significantly, when asked about the
possibility of other individuals matching the profile of appellant, Gahn stated
that the frequency of this profile “would be less than one in 570 quadrillion”
and “it would be very unlikely” that any other individual “would also match”
this profile.  The jury was entitled to
rely upon the DNA evidence in finding that appellant assaulted the
complainant.  See Glover v. State, 825 S.W.2d 127, 127 (Tex. Crim. App. 1992); see also King v. State, 91 S.W.3d 375,
380 (Tex. App.—Texarkana 2002, pet. ref’d) (stating that DNA evidence is
admissible to prove identity); Oliver v.
State, No. 14-09-00690-CR, 2010 WL 3307391, at *2 (Tex. App.—Houston [14th
Dist.] Aug. 24, 2010, no pet.) (mem. op., not designated for pub.) (noting that
defendant was major contributor to DNA mixture, and stating that DNA evidence
is admissible to prove identity).    

 The complainant did not testify as to whether
the assailant used a condom or ejaculated, but she did state that the assailant
inserted his penis into her vagina and engaged in intercourse for approximately
two to three minutes.   Additionally,
although the complainant admitted to “prostituting,” the jury could have
reasonably concluded from her testimony that she had engaged in the act of
prostitution in limited circumstances. 
When asked if she had previously engaged in prostitution, the
complainant testified that she had engaged in oral sex with another man on only
one other occasion.  There is no other
evidence that the complainant engaged in prostitution or sexual activity with
other men around the time of her assault. 


In regard to appellant’s argument
regarding consent, although the complainant stated that she had initially
agreed to engage in sexual intercourse with the assailant while at the gas
station, she testified that after getting into the assailant’s car, he pointed
a gun at her head and forced her to engage in sexual intercourse against her
consent.  She also noted that the
assailant kept her purse.  We hold that
the evidence is sufficient to support appellant’s conviction for aggravated
sexual assault.

We overrule appellant’s second
issue.

Impeachment with Prior Conviction

In his first issue, appellant argues
that the “trial court constructively denied [him] his right to testify in his
own behalf by ruling that the State could impeach [him] with his [prior] sexual
assault conviction” because the State failed to demonstrate that the probative
value of this prior conviction outweighed its prejudicial effect.

Appellant filed a pretrial “Motion
to Testify Free from Impeachment,” in which he argued that the probative value
of any prior convictions for purposes of determining his credibility was
“vastly outweighed” by the prejudicial effect of this impeachment evidence.  At a pretrial proceeding, appellant’s counsel
disclosed that appellant’s criminal history included a sexual assault
conviction from 2006 and a misdemeanor assault from 1988.  Appellant’s counsel notified the trial court
that he would be filing on the following morning a motion to permit appellant
to testify free from impeachment, “especially to the sexual assault that he got
convicted of a couple years ago,” because it was “too closely associated” with
the instant case.   The trial court
stated that it would make a ruling on the motion when counsel presented
it.  The record reflects that the trial
court denied appellant’s motion to testify free from impeachment.  Appellant subsequently decided not to testify
during the guilt phase of the trial.  

Evidence of a witness’s prior
conviction shall be admitted for purposes of impeachment if the crime was a
felony or a crime of moral turpitude and the court determines that the
probative value of admitting the evidence of the conviction outweighs its
prejudicial effect.  Tex. R. Evid. 609(a).  The Texas Court of Criminal Appeals has set out
a non-exclusive list of factors courts should use to weigh the probative value
of a conviction against its prejudicial effect.  Theus v.
State, 845 S.W.2d 874, 880–81 (Tex. Crim. App. 1992).  Such factors include (1) the impeachment value
of the prior crime, (2) the temporal proximity of the past crime relative to
the charged offense and the witness’s subsequent criminal history, (3) the
similarity between the past crime and the charged offense, (4) the importance
of the witness’s testimony, and (5) the importance of the witness’s
credibility. Id. The proponent
seeking to introduce evidence pursuant to rule 609 has the burden of
demonstrating that the probative value of a conviction outweighs its
prejudicial effect.  See id. at 880.

To preserve error from a trial
court’s pretrial ruling to allow impeachment of a defendant’s testimony with
prior convictions, a defendant must testify, because without the testimony, a
harm analysis cannot be conducted.  Long v.
State, 245 S.W.3d 563, 572–73 (Tex. App.—Houston [1st Dist.] 2007, no pet.);
Morgan v. State, 891
S.W.2d 733, 735 (Tex. App.—Houston [1st Dist.] 1994, pet. ref’d); see also Luce v. United States, 469 U.S.
38, 43, 105 S. Ct. 460, 464 (1984).  Because
appellant did not testify during the guilt phase of the trial, we hold that he
failed to preserve any error regarding the trial court’s ruling on his pretrial
motion to testify free from impeachment during this phase of trial.[2]  Long,
245 S.W.3d at 572–73.

We overrule appellant’s first
issue.

 

 

 

 

Conclusion

          We
affirm the judgment of the trial court.

 

 

                                                                   Terry
Jennings

                                                                   Justice


 

Panel
consists of Justices Jennings, Sharp, and Brown.

Do
not publish.   Tex. R. App. P. 47.2(b).











[1]           See
Tex. Penal Code Ann. § 22.021
(Vernon 2010).





[2]
          Additionally, a defendant does not have the right to testify free from
impeachment.  Grant v. State, 247 S.W.3d 360, 367 (Tex. App.—Austin 2008, pet.
ref’d); Brent v. State, 916 S.W.2d
34, 40 (Tex. App.—Houston [1st Dist.] 1995, pet ref’d).  Thus, even if appellant had preserved his
error, there is no legal authority to support appellant’s assertion that, by
denying his motion, the trial court
“constructively denied” him his right to testify.  Finally, we note that, during the punishment
phase of trial, appellant testified that he had elected not to testify
during the guilt phase of trial based upon his lawyer’s advice.  Appellant also asserts in his brief that, had
he testified during the guilt phase, he would have testified (consistent with
his testimony during the punishment phase) that he engaged in consensual
intercourse with the complainant.  To the
extent that appellant asks us to consider his punishment-phase testimony as
some type of proffer as to what he would have testified to during the guilt phase
of trial, we conclude that his punishment-phase testimony does not
preserve his complaint.  See Luce
v. United States, 469 U.S. 38, 41 n.5, 105 S. Ct. 460, 463 n.5 (1984)
(noting that “a proffer of testimony is no answer” to the preservation problem
because a defendant’s “testimony could, for any number of reasons, differ from
the proffer”).  In sum, appellant’s
punishment phase testimony does not preserve his complaint that he was denied
his right to testify free from impeachment.